Clemson Bros., Inc. v. Commissioner.
Clemson Bros. v. Commissioner
Docket No. 7663.
United States Tax Court
1947 Tax Ct. Memo LEXIS 158; 6 T.C.M. (CCH) 799; T.C.M. (RIA) 47188; June 30, 1947
*158 Invested Capital. - Held, that petitioner has not established that the good will or intangibles of the predecessor owner of its business had any fair market value at the time of petitioner's acquisition thereof for stock in October 1917. Held, further, that respondent did not err in excluding such intangibles in his computation of petitioner's invested capital under section 718 I.R.C. for the purpose of determining its excess profits tax for the year ended September 30, 1941. Geo. E. H. Goodner, Esq., Munsey Bldg., Washington 4, D.C., for the petitioner. Harold D. Thomas, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent has determined an over-assessment of $153.52 in income tax and a deficiency of $24,088.62 in excess profits tax for the taxable period ended September 30, 1941. All of the asserted deficiency is in controversy. Petitioner alleges that in computing its equity invested capital for the purpose of determining excess profits tax for the taxable period, the respondent erred in excluding therefrom the sum of $759,376.97 as the value of good will or intangibles acquired by *159 petitioner for certain of its stock in 1917. The sole question presented is one of fact, namely, what was the fair market value, if any, on October 1, 1917, of the good will or intangibles of the predecessor owner acquired by petitioner as of that date for its capital stock. Findings of Fact The petitioner is a corporation with its principal office at Middletown, New York. Its tax return for the taxable period involved was filed with the collector for the fourteenth district of New York. Petitioner was incorporated on October 1, 1917, under the laws of New York, with an authorized capital stock of $2,000,000, consisting of 20,000 shares of the par value of $100 each, for the purposes: of acquiring the saw manufacturing business of Clemson Bros. and George N. Clemson of Middletown, New York, a sole proprietorship, and of engaging generally in the business of manufacturing and selling metal cutting hacksaw blades and other metal and mechanical devices. The petitioner's certificate of incorporation sets forth that its capital stock was subscribed to by George N. Clemson 19,980 shares, Richard D. Clemson 10 shares, and William E. Cross 10 shares, and that those three men were its *160 incorporators and also its directors for the first year. Richard D. Clemson was the son of George N. Clemson and had been an employee of the business since 1907 at a salary ranging from $1200 to $3,000 per annum, and William E. Cross was the son-in-law of George N. Clemson and had been an employee of the business continuously since 1915. George N. Clemson was elected president of petitioner at an annual salary of $30,000; Richard D. Clemson was elected vice-president at an annual salary of $15,000; and William E. Cross was elected secretary-treasurer at an annual salary of $15,000. Upon resolutions adopted at the meeting of its incorporators and stock subscribers on October 9, 1917 and a meeting of its board of directors on the same date, the petitioner accepted an offer to purchase "the saw manufacturing business of Clemson Bros. and George N. Clemson, including * * * the good will thereof," all the real and personal property, machinery, equipment, materials, goods on hand, bills and accounts receivable, etc., "trademarks, trade names, patents, patent applications" and contracts in consideration for petitioner's issuance of 19,980 shares of fully paid capital stock having a par *161 value of $1,998,000, to George N. Clemson and petitioner's assumption of the outstanding indebtedness and contracts of the business. In those resolutions it was set forth that the purchase price was considered to be the "fair value" of the business, property, and rights to be transferred to petitioner. On October 16, 1917, the petitioner's board of directors adopted a resolution setting forth that Clemson Bros. and George N. Clemson had transferred their business, property, and rights to petitioner; and that the inventory and appraisal of the value thereof made by petitioner's officers and accepted and approved by the directors was, briefly, as follows: Land
$ 45,000.00
Buildings
70,620.00
Saw Machinery and Equipment
200,770.00
Machine Shop Equipment
17,983.05
Miscellaneous Factory Equipment
33,280.24
Patterns
2,500.00
Office Fixtures
5,000.00
Accounts Receivable
136,916.08
Consigned Goods
81,085.06
Cash
161,836.58
Finished Goods
49,740.77
Goods in Process
210,689.51
Steel
211,700.00
Miscellaneous Steel, Fuel, Supplies
11,501.74
"TRADE MARKS, GOOD WILL
ETC. Difference between the val-
ues placed upon all physical assets
as above and the purchase price of
$1,998,000.00"
759,376.97
TOTAL
$1,998,000.00
*162 Prior to incorporation of petitioner on October 1, 1917, George N. Clemson, his son, and son-in-law had discussed the whole matter of the incorporation of the business of Clemson Bros., the value to be placed on that business, and the amount of stock to be issued by the proposed corporation. Upon incorporation of petitioner it issued 19,980 shares of capital stock to George N. Clemson for the business, property, and rights transferred to it and also issued 10 shares each to Richard D. Clemson and William E. Cross, who each paid $1,000 in cash therefor. The above mentioned properties and rights transferred to petitioner as of October 1, 1917 and the officers and directors appraised values thereof were entered in petitioner's minute book and books of accounts, in greater detail, but in equal total amounts as set forth in the next preceding paragraph. Such appraised values were acquiesced in by George N. Clemson, Richard D. Clemson, and William E. Cross, and were arrived at by them on the basis of a so-called rule of thumb formula of capitalization of average earnings, namely, approximately 10 times estimated earnings of $200,000 a year. Such valuation did not take into consideration *163 the cost of assets on hand because no single item of cost could be established from Clemson Bros. books of accounts, which were not kept in accordance with modern accounting methods; and the estimated average earnings figure used in the formula was not shown by the books of accounts, but was arrived at closely enough to satisfy the incorporators. The original business was founded in 1879 under the firm name of Clemson Bros. and from about 1881 until the incorporation of the business in October 1917 it was continuously operated under that firm name as the wholly owned sole proprietorship of George N. Clemson. Since its inception, the business has been the manufacture of a metal cutting saw blade, commonly known as a "hacksaw" blade which is made by cutting thin sheet steel into short, narrow strips or "blanks" and processing each blank through several steps including cutting and setting the teeth on one edge, rounding the ends, punching a hole at each end for attaching the blade to the saw frame and heat treatment for hardening. The original hacksaw blade produced by Clemson Bros. was made largely by hand work and of comparatively soft steel which dulled easily, but could be resharpened *164 with a file. George N. Clemson conceived and put on the market a hacksaw blade produced by machinery and made of steel so hard that it could not be filed for resharpening, but was so cheap that when it became dull it could be discarded for a new blade. The blades were made by hand until 1909. By 1909 Clemson Bros. had begun the use of automatic machinery in producing the blades. Until 1912 and for some time thereafter, Clemson Bros. produced saw blades for use in hand saws only and between 1912 and 1917 machinery was designed and built for production of power saw blades. All of the machinery was designed and developed exclusively by George N. Clemson prior to 1909 and thereafter by him and his son Richard. Throughout the years all of Clemson Bros. machinery, except heavy castings, was built in its own machine shop by its regularly employed machinists. The latter also made spare parts and repairs, and did all ordinary maintenance work so that the machinery was maintained in good working condition at all times regardless of how long it was kept in use. No patents were obtained on Clemson Bros. specially built machinery, but certain features of its saw blade were patented. By 1941 those *165 patents had long since expired. During World War I, Clemson Bros. was a subcontractor for fabricating and heat-treating light armor plate, gun shields, tractor armor, and caisson armor, in addition to its regular business of producing hacksaw blades. During all the years preceding October 1917 the books of accounts of Clemson Bros. were kept generally on a cash basis, but, as above stated, were not maintained in accordance with modern accounting methods. The cost of new machinery, repair parts, and major repairs were not differentiated from the cost of ordinary maintenance and all such costs were charged to ordinary business expense, including the cost of machinery and tool steel and the wages of machinists who made new machinery and tools. All expenditures of the business were entered in a one-column expense account on the cash book; no capital account was maintained; no depreciation was taken on depreciable assets; and no inventories were maintained. Accounts receivable were kept in a memorandum account which was charged with the amounts of sales to its one customer, the Miller Falls Company, and credited with collections made. George N. Clemson collected all money on such accounts *166 receivable, deposited the funds in his personal checking account, and as the business needed funds to pay bills he deposited the required amounts in Clemson Bros. bank account for the office manager to write checks against. There was also maintained on the books a personal account of George N. Clemson in which were entered certain items of his household and other personal expenses paid out of Clemson Bros. bank account. George N. Clemson drew no salary, as such, from Clemson Bros., but withdrew from the funds of the business whatever money he wanted or needed for his personal living expenses, etc. For each of the years 1911 to 1916 and nine months in 1917 to September 30, the books of Clemson Bros. disclose the following figures for gross sales, all factory costs and expenses (including the cost of machinery and improvements, wages, etc.), and the net after deducting all factory costs and expenses from the gross sales.. Factory Costs
Year
Gross Sales
and Expenses
Net
1911
$244,648.13
$117,190.05
$127,458.08
1912
261,909.68
112,848.20
149,061.48
1913
244,692.15
159,406.81
85,285.34
1914
236,388.71
135,163.61
101,225.10
1915
356,304.92
136,828.94
219,475.98
1916
650,771.55
399,757.82
251,013.73
1917 (9 months to Sept. 30)
635,157.12
616,036.56
19,120.56 *
*167 Practically from the inception of the business up to October 1917 and pursuant to a continuing mutually satisfactory agreement, Clemson Bros.' entire output of hacksaw blades was taken by its one customer, the Miller Falls Company, which sold them in boxes bearing the latter's name label and also the words "The Star" which was one of Clemson Bros. registered trade marks. The words "The Star" also appeared on the packages in which the blades were "wrapped up." The Miller Falls Company manufactured a complete line of small tools, except hacksaw blades, and marketed them in its world-wide trade. An average of 25 per cent of the blades produced by Clemson Bros. went into export trade, but Clemson Bros. itself did no exporting. While the name of Clemson Bros. did not appear on its product or the boxes in which it was sold, a five pointed star within a circle, another registered trade mark of Clemson Bros., was stamped into each hacksaw blade. The symbol of the star stamped into the blade was used by Clemson Bros. as its trade mark from the beginning of its business up to October 1917 and was originally registered with *168 the United States Patent Office in the name of George N. Clemson in 1885 and renewed as often as required. The trade mark consisting of the words, "The Star," was originally registered with the United States Patent Office in the name of George N. Clemson in 1905. Those trade marks which were also registered in many foreign countries, were a valuable asset of the Clemson Bros. business and over a long period of years the "Star" hacksaw blade has been a leader in its field and its quality has been a standard for hacksaw blade specifications. In October 1917, after acquiring the business assets and liabilities of the sole proprietorship, the petitioner continued the business of producing hacksaw blades, continued to use the trade marks, and also continued to sell its entire production of hacksaws to the Miller Falls Company until about 1920. The assets acquired in October 1917 were entered on petitioner's books at the values assigned to them by the incorporators as hereinbefore set out, including the item of $759,376.97 for good will or intangibles, and modern accounting methods were initiated. The initial annual salaries of $30,000 for George N. Clemson and $15,000 each for Richard *169 D. Clemson and William E. Cross were agreed upon by those three incorporators as reasonable salaries based on Clemson Bros.' volume of business and accompanying responsibilities which had increased at the time of incorporation due to World War I. In its return for the taxable period ended September 30, 1941 and for the purpose of computing excess profits tax the petitioner arrived at the reported amount of its average invested capital by including the sum of $759,376.97 as representing the value of good will or intangibles acquired for stock upon its organization in October 1917. In arriving at petitioner's excess profits tax liability for the taxable period, the respondent determined that the excess profits net income under the invested capital method is $293,424.25; that the invested capital is $1,828,260.48; that the excess profits credit is $146,260.84; that the adjusted net income is $142,163.41; that the total excess profits tax liability is $48,365.36; and that there is a deficiency in excess profits tax of $24,088.62. In arriving at the above amount of petitioner's invested capital, for the taxable period, the respondent, without including therein any sum for the value of *170 good will or intangibles acquired in October 1917, determined that the average invested capital is $1,901,658.60 made up of the following amounts: Money paid in for stock
$ 163,836.58
Property paid in for stock
1,076,786.45
Accumulated earnings and profits
661,035.57
Total
$1,901,658.60
The good will or intangibles of the sole proprietorship Clemson Bros., acquired by petitioner as part of the consideration for its stock as of October 1, 1917 did not have a fair market value in any amount ascertainable from this record. Opinion There is no dispute herein as to the respondent's determination of petitioner's invested capital for the taxable period, in so far as it involves petitioner's tangible assets. The petitioner's complaint is that respondent failed to include in his computation of invested capital the alleged value, in the amount of $759,376.97, of the good will or intangibles acquired by petitioner for stock as of October 1, 1917. The parties are in agreement that good will or intangible assets may be included in invested capital determined under the provisions of section 718, I.R.C., [1] and they disagree only as to the fair *171 market value of the good will or intangibles of the sole proprietorship when acquired by petitioner for stock on October 1, 1917. The petitioner cites as the appropriate method of valuation with variations in the instant case, A.R.M. 34, 2 C.B. 31. The A.R.M. provides briefly for determining value of good will or intangibles of a business by capitalizing average net earnings attributable to intangibles over a selected period of years preceding the basic date. Respondent does not question the use of that formula in proper cases, but contends it is not applicable here, because of failure of proof of essential basic facts. *172 The respondent determined, and now contends, that the intangible assets in question had no value when acquired, while petitioner contends that the evidence adduced and the application thereto of the above mentioned formula, with variations, establish a fair market value of such assets of at least $759,376.97 on October 1, 1917. Both parties state that the question presented for our determination is one of fact. At the outset, it may be said that the proceeding of Clemson Bros., Inc., 15 B.T.A. 1145, involving, inter alia, the taxpayer's invested capital for the years ended September 30, 1918 and 1919, under Revenue Acts applicable to those years, is not dispositive of or controlling in the instant case, for in that former case it was held that there was a failure of proof of any value for the good will acquired for stock on October 1, 1917. In our opinion, the record does not afford sufficient evidence to establish any fair market value of the good will or intangibles of the predecessor owner of petitioner's business at the time of the petitioner's acquisition thereof for stock in October 1917. In addition to the evidence establishing the facts as found herein, *173 petitioner introduced certain exhibits prepared by a public accountant for the purpose of establishing certain basic facts and the testimony of a valuation expert witness for the purpose of establishing the fair market value of the good will or intangibles involved herein. The exhibits were prepared by the accountant as a foundation for the opinion testimony on value and were intended to show, for the years 1911 to 1916, inclusive, and the first nine months of 1917, the sole proprietorship's: estimated tangible assets at the beginning of each of those periods; estimated average tangible assets for that whole period; estimated net earnings for each of those six years and the nine months; and estimated average net earnings for that whole period. The valuation expert witness assumed that the accountant's figures were correct and applied thereto a mathematical computation based, with variations, on the formula prescribed in A.R.M. 34, supra, and more particularly on the basis of a seven per cent normal return on the amount of the accountant's estimated average tangible assets and the capitalization at between 12 and 15 per cent of the excess of the accountant's estimated average net earnings *174 of the business over that seven per cent return, which excess the expert treated as the average net earnings attributable to the sole proprietorship's intangible assets over the period from 1911 to September 30, 1917, inclusive. He then arrived at his opinion of $750,000 as being the fair market value of the good will or intangibles on October 1, 1917. Aside from other considerations bearing upon the weight to be given the testimony of the valuation expert witness, his opinion of the fair market value of good will of intangibles on October 1, 1917 is entitled to no greater weight than is afforded by the accuracy of the basic facts and figures submitted by the accountant; and the expert himself complained of the "lack of definiteness in some of the figures" used by the accountant. The public accountant no doubt did the best he could with the inadequate books of account of the sole proprietorship in his effort to establish therefrom an estimate of the average tangible assets and the average net earnings. However, the exhibits prepared by that witness contain not only certain figures reflected in the sole proprietorship's books of account, such as gross sales and total factory expenses, *175 but also figures representing the witness' own conclusions of fact without supporting figures appearing on those books, such as: (1) his conclusion of what would be reasonable compensation for George N. Clemson as sole proprietor for his services; (2) his conclusion that capital items charged to expense offset the amount which should have been charged off for depreciation; (3) his conclusion as to the amount of net withdrawals of George N. Clemson; and (4) his conclusion as to the amount of the net income for each year of the selected period and the average net income for the whole period. The sole proprietorship never maintained a capital account and throughout the years the costs of all new machinery developed in its own plant and of improvements thereon were charged to current operating expense and no depreciation thereon was ever charged off. The public accountant computed average tangible assets by starting with tangible assets in an amount approximately as inventoried and valued by petitioners' incorporators as of September 30 or October 1, 1917, and worked backwards for each year of the selected six years and nine months period by adding what he concluded to be George N. Clemson's *176 net withdrawals per year and deducting what he concluded to be the net income of the business per year and then taking an average for the whole period. The accountant computed the average net income by starting with gross sales for each year as shown by the books of account, deducting total factory expenses for each year as shown by those books, and also deducting what he determined as an allowance for compensation for George N. Clemson based on a percentage of the sales for each year and then taking an average for the whole period. In arriving at his figures of net income he did not take into consideration inventories at the beginnings or ends of the years or depreciation since the books contained no entries with respect to either. The testimony of the two witnesses to show the cost or inventoried value as of October 1, 1917 of capital items acquired by the business between 1911 and October 1, 1917 is based on speculation rather than on facts established by the record. The testimony and exhibits herein do not establish sufficient basic facts to support the opinion evidence of value of good will or intangibles; or to support the valuation thereof made by the incorporators as of October 1, 1917 which *177 consisted of inventorying and valuing the tangible assets at a total of $1,238.623.03 and then merely ascribing the amount of $759,376.97 to good will and intangibles to make up the total of $1,998,000 the three interested incorporators had agreed upon prior to the incorporation of petitioner; or, to support any conclusion of fact by this Court that the good will or intangibles acquired by petitioner for stock on October 1, 1917 had any fair market value at the time of acquisition. We hold that there is a failure of proof on the question of fact presented herein. Accordingly, we find no error in respondent's determination of petitioner's invested capital for the purpose of computing its excess profits tax for the taxable period ended September 30, 1941. Decision will be entered for the respondent. Footnotes
*. Determined by respondent in a prior year to be $254,094.38.↩
1. Section 718 (a) (1) and (2), I.R.C. as added by section 201 of the Second Revenue Act of 1940 and prior to the effective date of the amendment by section 218 of the Revenue Act of 1942: "SEC. 718. EQUITY INVESTED CAPITAL. "(a) Definition. - The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b) - "(1) Money paid in. - Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; "(2) Property paid in. - Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined in the same manner as if the property were still held at the beginning of such taxable year. If such unadjusted basis is a substituted basis it shall be adjusted, with respect to the period before the property was paid in, in the manner provided in section 113 (b) (2);↩